IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

<table>
<tr><td>UNITED STATES OF AMERICA</td><td>)</td><td>CRIMINAL CASE NO. 04-10231-MLW</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>PETER V. MAGGIO, III, <em>ET AL.</em></td><td>)</td><td></td></tr>
</table>

## GOVERNMENT'S TRIAL BRIEF

The Government submits the accompanying Trial Brief for this Court's consideration in connection with trial of the captioned case, scheduled for June 5, 2006.

This Trial Brief is filed 10 weeks in advance of trial. The Government reserves the right to supplement or modify its Trial Brief in light of pleadings, if any, filed by the defendants and changed circumstances in advance of trial.

Respectfully submitted this 24th day of March, 2006.

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY


By: /s/VICTOR A. WILD
    VICTOR A. WILD
    Assistant U.S. Attorney
    One Courthouse Way
    Boston, MA 02210
    (617) 748-3100

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served upon the attorneys listed below a copy of the foregoing document.

<u>/s/ VICTOR A. WILD</u>
VICTOR A. WILD
Assistant U.S. Attorney


James M. Merberg, Esq.          Roger Witkin, Esq.
66 Long Wharf                   6 Beacon Street
Boston, MA 02110                Boston, MA 02108
Attorney for Peter V. Maggio    Attorney for Matt A. Havey


Joseph S. Oteri, Esq.           Elliott M. Weinstein, Esq.
20 Park Plaza                   228 Lewis Wharf
Boston, MA 02116                Boston, MA 02110
Attorney for Michael R. O'Neill Attorney for William A. Howe

Scott P. Lopez, Esq.            William M. White, Esq.
24 School Street                1 Faneuel Hall, 3rd Floor
Boston, MA 02108                Boston, MA 02109
Attorney for Louis A. Paradiso  Attorney for Sean Sacco

## GOVERNMENT'S TRIAL BRIEF

1.    **STATUS OF THE CASE**

The Grand Jury returned an Indictment on August 12, 2004, charging PETER V.

MAGGIO, JEFFREY A. DEVEAU, MICHAEL R. O'NEILL, WILLIAM HOWE,

MATT A. HAVEY, LOUIS A. PARADISO, and SEAN SACCO with Conspiracy (§371) and an

aggregate of seven (7) counts of Mail Fraud (§1341).  MAGGIO is separately charged with 3

additional counts of Interstate Transportation of Stolen Property (§2314).  The defendants are

charged as follows:

      MAGGIO:    Counts 1, 2- 8, and 9-11

      DEVEAU:    Counts 1, 2-4 and 6

      O'NEILL:    Counts 1, 2-3 and 6

      HOWE:    Counts 1, 2-8

      PARADISO:  Counts 1, 2-5

      HAVEY:    Counts 1, 7-8

      SACCO:    Counts 1, 6

DEVEAU has pleaded guilty to charges in the Northern District of New York pursuant to

Fed.R.Crim.P. Rule 40, and is expected to testify at the trial of co-defendants.  MAGGIO has

informed this Court that he will plead guilty.  On the date of this Government filing, the

remaining defendants have stated an intention to proceed to trial.[1]

---

[1]  Significant plea discussions have occurred with three of the five remaining defendants.
As of this date, plea agreements have not been executed.

2.    **SUMMARY OF THE CHARGES**

The Indictment alleges that from July 1998 to May 2000, the defendants participated in a scheme using "straw" borrowers and fraudulent financial information to obtain commercial loans for the purchase and lease of heavy duty equipment for MAGGIO's companies operating in Medford, Massachusetts under the names Earth Site and Utility Corporation and Earth Management and Equipment Co., Inc.  The Indictment charges HAVEY, PARADISO and SACCO as "straw" borrowers who signed fraudulent loan documents in their names -- in their personal capacities and/or in their names as "dba" operators of newly-created shell entities. PARADISO, HAVEY and SACCO received significant financial benefits for their participation as "straws." Fictitious corporate and financial documents were used to obtain the loans.  Despite signing as the borrowers on loan documents, the "straw" borrowers exercised virtually no control over the use of the funds or the proposed repayment of the funds.   The loan proceeds were used by MAGGIO as he saw fit.  Moreover, the "straw" borrowers had neither the capacity nor the intention to repay the loans, relying instead entirely upon MAGGIO to make any payments. HAVEY, PARADISO and SACCO were the principle "straw" borrowers involved in the scheme.  They each were "insiders" in the scheme, dealing directly and routinely with MAGGIO, paid for their services, and repeatedly involved in "straw" loans.  From June 1999 to October 1999, HAVEY was involved in 12 loans obtained through 7 lenders for the purchase of 20 pieces of equipment, in the aggregate amount of $2,121,902.12.  Similarly, between November 1998 and October 1999, SACCO was involved in 9 loans totaling $1,147,480.00.[2]  In

---

[2]     During the period of the charged offenses, HAVEY and SACCO also signed as "straw" borrowers for MAGGIO on loans not charged in the Indictment.  HAVEY signed as the purported borrower on a fraudulent $28,300 loan in the name of Metropolitan Transportation for

like manner, from January 1998 to October 1999, PARADISO was involved in 20 loans

aggregating $4,210,790.50. [3]

The Indictment charged that DEVEAU helped MAGGIO obtain fraudulent loans to

purchase and lease construction vehicles from DEVEAU's construction equipment dealership in

Syracuse, New York, some involving genuine sales and others involving fictitious deals, and that

DEVEAU shared the proceeds with MAGGIO.  The Indictment charges that O'NEILL solicited

and received kickbacks approximating $100,000 from DEVEAU to obtain approval for

fraudulent loans through The CIT Group, a lending company he worked for as district sales

manager.[4]  The Indictment further alleges that O'NEILL received kickback funds from

MAGGIO.  Moreover, O'NEILL not only failed to disclose his own interest in the loans, but

unilaterally increased bogus figures on certain loans to increase his fees.  The Indictment charges

that HOWE, an accountant, was paid by MAGGIO to prepare fictitious financial records for

submission to the lenders.  In addition, MAGGIO is charged separately with interstate

_____

the purchase of a vehicle obtained by MAGGIO for a purported limousine service.  SACCO was
a "straw" borrower for a $151,872.96 real estate mortgage used to purchase a home for
MAGGIO in Everett, MA.

[3]     Other loans involved individuals who, unlike the charged defendants, were not paid
for their services and/or were never aware that their names had been used to obtain loans and/or
were not involved in multiple loans.  By way of one example, Angelo Fenno is over 80 years old
and was introduced to MAGGIO by PARADISO.  FBI reports disclosed to the defense reflect
that Fenno gave MAGGIO his social security number and was asked to sign a credit application,
but was unaware that a "dba" in the name of "Fenno & Sons" had been formed and used to
obtain loans.

[4]     The allegations include payments delivered to O'NEILL on dates when he was under
FBI surveillance.

transportation of stolen property for obtaining fraudulent duplicate titles to illegally sell vehicles which had been obtained by fraud.

O'NEILL, PARADISO, SACCO and HAVEY failed to report to the IRS the cash they received for their roles in the criminal enterprise.

Virtually every loan went into default for non-payment. When lenders attempted to foreclose, they successfully repossessed many of the vehicles, but a number were never located, some had been financed with multiple lenders, and approximately a dozen had been sold to third parties under "washed" titles. The net losses reported from lenders aggregate $15,731,860.33.[5]

## 3.    THE OFFENSE STATUTES

### A.    COUNT 1:  Conspiracy – 18 U.S.C. § 371

| Whenever: | 1. | Two or more persons |
| | 2. | Conspire to commit |
| | 3. | Any offense against the United States and |
| | 4. | One or more does any act in furtherance thereof, |

they are guilty of conspiracy.

The present case is a classic hub and spoke conspiracy with MAGGIO at the hub and various adjuncts on the spokes.  See United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999). The Portela Court promulgated a tripartite test to determine whether the evidence supports a single "over-arching" conspiracy or multiple conspiracies: 1) a common goal; 2)

_____

[5]  The following losses have been determined: CNH Capital, formerly New Holland Credit -- $8,552,393.17; Volvo Commercial Finance, LLC -- $476,034.30; The CIT Group -- $4,963,832.97; Green Tree Servicing, LLC -- $72,179.69; U.S. Bancorp Leasing & Financial -- $266,307.39; ORIX Financial Services, Inc. -- $ 118,107.75; Eastern Bank -- $6,681.31; General Electric Capital Corp. -- $ 901,129.67; Caterpillar Financial Services Corp. -- $ 69,817.26.  In addition, O'Connor GMC reported a loss of $ 305,376.82 involving loans granted "with recourse", whereby lenders could hold the dealership liable for losses.

interdependence among participants; and 3) overlap among participants.  It is not necessary for each member of a conspiracy to have intimate knowledge of each and every other co-conspirator for there to be one conspiracy.  If the conduct of each co-conspirator is such that each participant must have known he or she was a part of a much larger criminal undertaking, a single conspiracy is indicated.  See United States v. Borelli, 336 F.2d 376, 383 (2d Cir. 1964).

Here, the common goal of the conspiracy was to obtain commercial loans for tractor trucks and construction equipment in the names of various purported borrowers.[6]  Each of the "straw" borrowers were "spoke" participants who knew that their names -- personally and/or in their names as purported operators of newly created "dba" shell entities -- were being used to purchase and lease trucks and equipment for MAGGIO.  The loans were in the names of the borrowers who were paid for their services, but each "straw" borrower had neither the intent nor the capacity to repay.  Each of the borrower "spokes" knew that they were part of a larger organization, personally knew at least some of the other "straw" borrowers, actually solicited or were solicited by other charged "straw" borrowers to join the scheme, and received payment and the promise of future income from the scheme.  Other "spoke" participants were: (1)  the operator of a truck and construction dealership who relied upon fraudulent "straw" loans to generate purported sales and fees, (2) the commercial loan broker who personally created certain bogus loan figures and received kickbacks for pushing through fraudulent CIT loans, and (3) the accountant who was paid to provide fictitious financial records for submission to commercial lenders.

---

[6]     Some loans included "add-on" expenses for installation of non-existent equipment to generate additional funds which MAGGIO deposited into an account in the name of Mass Equipment.

**B.    COUNTS 5, 6 and 8:        Mail Fraud – 18 U.S.C. § 1341**

| | | |
|---|---|---|
| Whoever: | | Having devised any scheme or artifice |
| | 1. | To defraud |
| or | 2. | To obtain money by false or fraudulent pretenses, representations or promises, |
| and | | For purpose of executing such scheme or artifice, |
| | 1. | Places matter in an authorized depository to be delivered by the Postal Service |
| or | 2. | Takes and receives such matter therefrom |
| or | 3. | Causes any such matter to be delivered |

is guilty of Mail Fraud.

Substantive Mail Fraud in this Indictment includes UCC-1 security filings with the

Massachusetts Secretary of State and individual town governments to secure commercial loans.

Such filings conform to the Supreme Court decision in Schmuck v. United States, 489 U.S. 705

(1989) upholding convictions based upon applications for titles filed with state authorities by

defrauded automobile dealers over the defendant's claim that such mailings were after-the-fact

and therefor not "in furtherance of" the mail fraud.  The Court held that the mailings of title

registration forms were an essential step in the passage of title and thus bore a sufficient nexus to

the execution of the fraudulent scheme.  Other substantive Mail Fraud counts involve lender

correspondence and Powers of Attorney.  See United States v. McCann, 366, F.3d 46, 50-53 (1st

Cir. 2004)(mailings served purpose of keeping scheme running and avoiding detection); United

States v. Serino, 835 F. 2d, 924, 928 (1st Cir. 1987) (1st Cir. liberally construing sections 1341

and 1343); United States v. Fermin Castillo, 829 F.2d 1194, 1199 (1st Cir. 1987) (determination

whether the mailed matter was "closely related to the scheme").


**C.    COUNTS 2, 3, 4 and 7:        Wire Fraud - 18 U.S.C. § 1343**

6

Whoever:    Having devised any scheme or artifice,

                1.      To defraud

or    2.      To obtain money by false or fraudulent pretenses, representations or promises,

and    For purpose of executing such scheme or artifice

                1.      Transmits

or    2.      Causes signals to be transmitted by means of wire communication in interstate or foreign commerce

is guilty of Wire Fraud.

The wire fraud statute is patterned upon the mail fraud statute. Intent to defraud must be shown and each communication charged must related to "the purpose of executing the scheme."

The significant difference between mail fraud and wire fraud is the requirement that the wire communication be interstate. Telefaxes are communications within the statute. As with mail fraud, wire communications (1) initiated by the defendant, (2) received by the defendant and (3) which the defendant knowingly caused to be made between third parties, are actionable, if sent interstate and done in furtherance of the scheme.

Wire fraud counts in the Indictment include fictitious financial statements submitted to lenders and insurance binders which were requirements for funding of commercial loans.

**D.    COUNTS 9, 10, 11  Interstate Transportation of Stolen Property  – 18 U.S.C. §2314**

Title 18, United States Code, Section 2314 provides in pertinent part:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods . . . of the value of $5,000 or more, knowing the same to have been stolen, converted or **taken be fraud** . . .

is guilty of a felony. See, Dowling v. United States, 473 U.S. 207 (1985) (discussing the reach of Section 2314).

7

To prove the Transportation of Stolen Property the evidence must show:

I.    **Property with the value of $5,000 or more.** The subject vehicles obtained by fraudulent loans were tractor trailers valued well in excess of $5,000.

II.   **Transportation in Interstate or Foreign Commerce.**
      The subject vehicles were obtained by fraud, titled in Massachusetts, and thereafter sold in New Hampshire, and resold in New York.

III.  **Knowledge that the property was stolen, converted or taken by fraud**.
      MAGGIO and others submitted false and fictitious financial information to finance the purchase of the subject tractor trucks, thus they were taken by fraud.

The First Circuit has stated that the Government is not required to prove the defendant knew that the goods would or did cross state lines. "[B]y its terms – interstate transportation of stolen goods '*knowing the same to have been stolen'* – the statute makes clear that the only knowledge required is that stolen goods are being transported." United States v. Strauss, 443 F.2d 986, 988 (1st Cir. 1971). In this prosecution, defendant MAGGIO acted with a much higher degree of knowledge in that MAGGIO submitted the phony loan financial documents and obtained "washed" duplicate titles to the vehicles for the specific purpose of selling them at a truck dealership in New Hampshire.

The First Circuit has also upheld conviction under § 2314 for the transportation of vehicles "taken by fraud." In United States v. Carrington, 96 F.3d 1 (1st Cir. 1996) the defendant tricked out-of-state car dealers into believing that they had received wire transfers in payment for four cars that were shipped to the defendant. The Court ruled:

> Carrington pled guilty to four counts of transporting or causing to be transported vehicles which he knew to be 'stolen, converted *and* taken by fraud.' However, the statute itself is phrased in the disjunctive, punishing the transport of goods known to be 'stolen, converted *or* taken by fraud.' as Carrington himself quotes in his brief. Carrington argues that there is no factual basis for the conclusion that the goods were stolen when transported, but makes no reference to conversion or fraudulent takings. But even if he were correct with respect to the 'stolen' prong

of the statute, he would still need to persuade us with respect to both of the other
two prongs.  However, Carrington does not contend that a factual basis is absent
to support the proposition that he caused the goods to be transported and that he
took them by fraud–an alternative basis for criminal liability under section 2314,
and a basis included in the information to which he pled guilty.  Even if Carrington
were to so argue, it would not profit him, since the presentence report established a
more than adequate basis for the plea under the 'taken by fraud' theory.

Id. at 5.

## 4.    POTENTIAL DEFENSE ISSUES

From pre-trial discussions with certain defense counsel, the Government anticipates

certain potential, albeit unavailing, defense claims.

### A.    Defense claim that it is not a crime to be a "straw" borrower

Counsel for defendants charged as "straw" borrowers have posited a defense that the act

of serving as a "straw" borrower does not constitute a crime of fraud.  To whatever extent the

legal construct has theoretical merit, it has no application in the present prosecution.

The legal implications of using "straw" loans to obtain lender funds has been analyzed by

the courts, specifically in the context of Misapplication of Funds By A Bank Officer in violation

of Title 18, United States Code, Section 656.  In United States v. Gens, 493 F.2d 216 (1st Cir.

1974), the First Circuit held that, for purposes of misapplication of funds by a bank officer under

18 U.S.C. § 656,[7] use of a nominal or "straw" borrower, in and of itself, does not constitute the

crime of misapplication of funds.  Id. at 222.  The Gens court reasoned that when a bank officer

---

[7]    18 U.S.C. § 656 holds, in pertinent part:

Whoever, being an officer, director, agent or employee of . . . any Federal
Reserve bank, . . . embezzles, abstracts, purloins or willfully misapplies any of the
moneys, funds or credits of such bank, . . .shall be [held criminally liable].

approves a loan to an individual who "is both financially capable and understands that it is his responsibility to repay," id., the mere fact that the officer knew the borrower would direct the funds to a third party beneficiary is insufficient to prove the loan constituted misapplication – "absent other circumstances." Id. Thus, in Gens, the government did not prove misapplication where *all* it showed was that the bank officers knew that the funds from loans they approved would be given to a third party. Id. at 223. As the First Circuit explained in a later case, the Gens rule is underpinned by "the belief that, *without more*, a rational factfinder cannot infer an intent to defraud the bank on the part of a bank official who simply makes a loan to a financially capable party who understands his/her repayment obligation." United States v. Brennan, 994 F.2d 918, 923 (1st Cir. 1993) (affirming defendant's conviction for misapplication of bank funds under § 656) (emphasis added). Gens does not speak to what conduct actually constitutes misapplication, nor does it provide a defense against actual proof of misapplication. Rather, it simply holds that when all the government proves is that the bank officer knew loan funds would be given by a financially responsible borrower to a third-party beneficiary, the government does not prove misapplication in violation of 18 U.S.C. § 656.

**Gens Does Not Apply to 18 U.S.C. §§ 1341, 1343 or 1344**

Although the logic of Gens might seem at first blush to be generally applicable to any loan where funds are directed to a third-party beneficiary, when a borrower is being prosecuted under the fraud statutes [18 U.S.C. § 1344 (Bank Fraud)[8], or, as here, under §§ 1341 (Mail

---

[8]    18 U.S.C. § 1344 states, in pertinent part:

Whoever knowingly executes, or attempts to execute, a scheme or artifice --

    (1) to defraud a financial institution; or

    (2) to obtain any of the moneys, funds, credits, assets, securities, or other property

Fraud) and 1343 (Wire Fraud)], <u>Gens</u> is distinctly inapplicable.[9]  In the § 656 context, <u>Gens</u>

stands for the unremarkable proposition that it is not a crime for a bank officer to approve a loan

to a financially responsible borrower who happens to use the funds for the benefit of someone

else.  In determining whether the bank officer has misapplied funds, the borrower's financial

capacity and intent to repay are of obvious import, since a bank officer who knowingly approves

a loan to a financially incapable or uncommitted borrower acts to the detriment of his institution.

Thus, on the facts of <u>Gens</u> itself, because all the government proved was that the bank officers

made a valid loan to a financially responsible borrower, it appeared that the officers had acted

exactly as bank officers are supposed to act, and thus did not misapply funds within the meaning

of § 656.  <u>See Gens</u>, 493 F.2d at 223.

To the contrary, a borrower violates the fraud statutes  whenever he obtains a loan by

materially misrepresenting the use or repayment of the funds (and in this case with the requisite

_____

> owned by . . . a financial institution, by means of false or fraudulent pretenses,
> representations, or promises;

shall be [held criminally liable].

[9]     In <u>United States v. Smith</u>, 46 F.3d 1223 (1st Cir. 1995), the First Circuit seemed to
assume without discussion that <u>Gens</u> could potentially apply in the § 1344 context.  <u>See id.</u> at
1237.  The court held  that, when the government prosecutes the beneficiary of a "straw" loan
under § 1344, <u>Gens</u> does not require the government to prove that the beneficiary actually
assured the borrower that the lender could not look to that borrower for repayment.  <u>See id.</u>
Because the <u>Smith</u> court found no instant application for <u>Gens</u>, any assumption that <u>Gens</u> could
apply to any of the fraud statutes has no controlling force.  Moreover, the facts of <u>Smith</u> are
sufficiently unique that the court's analysis of <u>Gens</u> in relation to § 1344 should be limited to the
specific circumstances of the case.  In particular, the individual facing conviction under § 1344
was the general counsel to the credit union that had been defrauded.  Thus, although <u>Smith</u>
involved a prosecution under § 1344, the facts at issue actually bore greater resemblance to
misapplication of funds by an insider/officer, the kind of situation contemplated for prosecution
under § 656.

use of mail or wire communications), since his omission of material information constitutes false or fraudulent pretenses.[10]  See, e.g., United States v. Moran, 393 F.3d 1, 4-5, 13-14 (1st Cir. 2004) (sustaining a § 1344 conviction based upon failure to disclose material information when applying for a loan; loan broker failed to disclose his own profit interests in obtaining loan, even though duty bound to do so).  Unlike § 656, which deals with the conduct of a bank officer, a borrower violates the correlated fraud statutes, when he "defrauds" or obtains funds by means of "false or fraudulent pretenses."  In this context, the borrower's financial responsibility is relevant only when the borrower has misrepresented it to the lender in order to obtain the loan.  The question under the fraud statutes, is not whether the nominal borrower *could* hypothetically repay the loan, but whether the borrower *in fact* applied for the loan in a truthful manner. Because a borrower's financial responsibility is of entirely different legal import under § 656 than under §§ 1341, 1343 and 1344,  this Court should not now import a legal standard from the one context to the others.[11]

**Gens Does Not Provide a Defense to the Fraud Charges**

Even if this Court were now to determine that Gens applies in the § 1344 context, and in the much more removed §§ 1341 and 1343 contexts, its application would be necessarily limited in scope.  Even in the § 656 context , Gens does not provide a defense, but merely holds that the

---

[10]    A false or omitted statement is material if it has "a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." Neder v. United States, 527 U.S. 1, 16 (brackets and internal quotation marks omitted).

[11]    Indeed, this Court already has accepted implicitly that the Gens principle applies against § 656 but not the fraud statutes.  In United States v. Brennan, 832 F.Supp 435 (D. Mass. 1991) (Wolf, J.), the Court analyzed the § 656 charge in light of Gens, see id. at 442, but did not apply Gens in relation to the § 1344 charge.  See id. at 439-40.

government cannot prove misapplication merely by pointing to the presence of a third-party beneficiary, so long as the named borrower has both the intent and capacity to repay. See 493 F.2d at 222. Similarly, if this Court were to find Gens relevant in the context of §§ 1341, 1343 and 1344, Gens would simply mean that the government cannot establish a fraud or the use of false pretenses just by proving, without more, that the nominal borrower gave the loan proceeds to a third-party beneficiary. Significantly, the First Circuit has held that financial responsibility was simply one circumstance in Gens, *not* an automatic defense, and that as a result, the district court properly declined to instruct the jury that any loan to a financially responsible borrower who understands his obligation to repay cannot constitute misapplication under § 656. See United States v. Wester, 90 F.3d 592, 596-97 (1st Cir. 1996) ("Gens did *not* bar a misapplication charge in every case where the straw happened to be a financially responsible borrower.") (emphasis in original). Misapplication and intent to defraud are findings that turn largely on the specific facts at issue, see id., and to the extent that Gens may be applied outside the context of § 656, it simply stands for the proposition that one factor (presence of a third-party beneficiary) does not alone prove fraud when the nominal borrower is financially responsible and understands his obligation to repay the loan. In any event, the "straw" borrowers charged in the present case had neither the financial capacity nor the intention of repaying the loans, relying instead entirely on co-defendant Maggio.

Within the First Circuit, a wide variety of facts has been held to support findings of "other circumstances." In the context of § 656, conduct by a bank officer which has given rise to a conclusion of misapplication includes: (1) knowingly causing false purposes to be recorded on the term sheet for a loan, Brennan, 994 F.2d at 923; (2) failing to follow normal bookkeeping

procedures when extending a loan, id.; (3) exceeding loan authority by making a loan, id.; (4)

making loans for the purpose of concealing the fact that other loans were delinquent, id.; (5)

structuring loans so as to avoid bringing them to the lender's board for approval, id. at 924; (6)

causing loans to be made for one's own benefit without following the lender's approval rules,

Wester, 90 F.3d at 596; and (7) suppressing information that the purpose of a loan was one that

the lender would not have approved, id.  Additionally, when Gens was mentioned in relation to

§ 1344 Bank Fraud, United States v. Smith, 46 F.3d 1223 (1st Cir. 1995), "other circumstances"

were held to include the borrower's maintenance of parallel sets of genuine and false certificates,

as well as the preparation of false financial statements in which numbers were inflated for the

purpose of obtaining larger loans.[12]  Id. at 1227, 1237.  Identically, the borrowers in this case

relied on false financial statements containing inflated numbers in order to secure their loans,

matters which constitute "defraud[ing]" and "false or fraudulent pretenses, representations, or

promises" under each of the Mail Fraud, Wire Fraud and Bank Fraud statutes, regardless of each

borrower's financial responsibility.  Likewise, where, as here, each "straw" borrower

misrepresented his capacity and intention to repay, he violated the statutes.  Furthermore, the

---

[12]    The court in Smith held:  "'other circumstances,' including the dual sets of
certificates of beneficial interest found in [a co-defendant's] files, support the jury finding of
fraudulent intent."  46 F.3d at 1237.  In its recitation of the facts, the court earlier explained:

> Smith and [a coconspirator] prepared false financial statements . . . .  Smith
> altered the purchase and sale agreements, sometimes inflating the purchase price
> by millions of dollars, in order to obtain larger loans.

Id. at 1227.  When the court later referred to unspecified "other circumstances," the preparation
of false financial statements and altered documents were almost certainly among the "other
circumstances" that it had in mind.

"straw" borrowers in this case misrepresented the particulars regarding the expected use and hoped-for repayment of the funds, again violating the fraud and misrepresentation prohibitions of the statutes. Against any of these misrepresentations, <u>Gens</u> can provide no defense to the charges of mail fraud and wire fraud in this prosecution.

**B.    Defense claim that defendants believed the loans would be repaid**

Discussions with certain counsel suggests that the charged "straw" borrowers may claim they are not guilty of fraud because they believed the loans in their names would be repaid.

The evidence will prove that each of the "straw" borrowers signed for loans totaling multi-million dollar amounts in their own names and as operators of freshly minted "dba" entities. The financial conditions of the defendants, as well as any supposed "dba" entities, could not begin to support qualification for, or responsibility for, the loans. The evidence will show that the"straw" borrowers did little, if anything at all, to assure either the validity or the repayment of their loans. The "straw" borrowers exercised no control over loan proceeds and had neither the means nor the intention of repaying the loans. Rather, they merely took payment for signing whatever documents MAGGIO directed, and relied entirely upon MAGGIO to use the proceeds and to repay the loans. Moreover, the evidence will prove that the "straw" borrowers were aware of facts from which they knew MAGGIO was himself, at best, an extreme risk for financial responsibility. Neither the facts nor the applicable caselaw can support a defense predicated upon defendants' belief that the loans would be repaid.

Quite apart from such evidence, the Government is not required to prove that the defendants intended to permanently deprive the lenders of its funds, and the defendants cannot rely upon the mere expectation that things would work out somehow. <u>See</u>, <u>e.g.</u>, <u>United States v.</u>

15

Brennan, 832 F.Supp. at 439 (Wolf., J.).  Any argument that defendants believed that, given

sufficient time the loans could have been repaid, "is of no legal consequence" to charges of

fraud, id. at 42, because no amount of honest belief that the scheme will ultimately succeed can

excuse fraudulent actions and false representations to obtain loan proceeds.  Id. at 439.  See,

also, United States v. Black, 684 F.2d 481, 484 (7th Cir. 1982); United States v. Painter, 314

F.2d 939, 943 (4th Cir. 1963); Getchell v. United States, 282 F.2d 681, 688 (5th Cir. 1961).

Courts have long  held that although good faith is a defense to charges of fraud, a mere belief in

the ultimate success of a business, however sincere, is not in itself a defense.  See United States

v. Boyer, 694 F.2d 58, 60 (3rd Cir. 1982); United States v. Beecroft, 608 F.2d 753, 757 (9th Cir.

1979); United States v. Amrep Corp., 560 F.2d 539, 547 (2nd Cir. 1977), cert. denied, 98 S. Ct.

731  (1978); United States v. Diamond, 430 F.2d 688, 691 (5th Cir. 1970).

 Moreover, an intent that the funds be repaid cannot vitiate the fraud by which those funds

were obtained.  The notion that the Government must prove the defendants possessed an "intent

to harm" their victims in a fraud scheme was squarely rejected in United States v. Kenrick, 221

F.3d 19 (1st Cir. 1999).  Acting en banc, the First Circuit specifically stated in the context of a

bank fraud conviction that it was taking "this opportunity to clarify the nature of the intent

element required...."  Id. at 22.  In unambiguous language, the court stated "we hold, therefore,

that the intent element of bank fraud...is an intent to deceive the bank in order to obtain from it

money or other property.  'Intent to harm' is not required."  Id. at 29.  The court further stated, in

noting its disagreement with the First Circuit's Pattern Jury Instructions, that:


 an ultimate purpose of either causing some financial loss to another or bringing

16

about some financial gain to oneself...is not the essence of fraudulent intent.
What counts is whether the defendant intended to deceive the bank in order to
obtain from it money or other property, regardless of the ultimate purpose.

Id.

**C.    Defense claim that defendants were not aware of the scope of the scheme**

In the event one or more defendant claims innocence on the assertion that he did not

know the true nature or full extent of the fraudulent scheme headed by MAGGIO, such an

assertion cannot negate guilt in the charged offenses.  By way of example, defendant O'NEILL

may assert that his solicitation and receipt of kickbacks from co-conspirator DEVEAU was an

agreement between them, and that O'NEILL did not thereby intend to join other named

defendants in their on-going criminal enterprise.  Such a claim would be of no avail in light of

the evidence and the applicable caselaw.

The evidence will show that whether O'NEILL knew the identities of the "straw"

borrowers or the scope of the fraudulent loan scheme involving other lenders, he affirmatively

joined the loan arrangement engaged in by DEVEAU and others charged in the Indictment –

indeed O'NEILL inserted himself into that arrangement and capitalized upon it for his own

benefit.  It is beyond quarrel that, absent the loan applications submitted and loan documents

executed by co-conspirators that are the substance of the charged scheme there would have been

no loans from which O'NEILL solicited and generated kickbacks for pushing those same loans

through CIT Group.  O'NEILL knowingly and intentionally assisted DEVEAU and MAGGIO in

obtaining approval for loans financed by The CIT Group, including some that would not

otherwise have been approved, thereby generating kickbacks for himself from DEVEAU and

MAGGIO.  Certainly, by corruptly assuring approval of CIT loans O'NEILL generated

17

additional loan proceeds for named borrowers, regardless of the extent to which he was aware of the details of their own corrupt agreements with MAGGIO.   Furthermore, O'NEILL increased his personal benefits by arbitrarily increasing bogus figures on some of the loans, thereby further evidencing his understanding that the subject loans were, at a minimum not entirely legitimate in his own eyes.  Certainly, O'NEILL's increased bogus figures generated not only additional fees for himself, but additional loan proceeds for named borrowers.  The evidence will not support a claim that an individual defendant did not factually join the conspiratorial scheme.

Nor can defendants, including O'NEILL, avoid the legal consequences of their conduct. The defendants are charged in the Conspiracy and substantive counts based upon their individualized conduct.  See, e.g., pp. 14 - 41 of Indictment, alleging particularized overt acts. This Court will doubtless instruct the jury to consider the evidence independently as to each defendant and as to each count.  See, e.g., 1 Sand, Modern Federal Jury Instructions, ¶3.01, Instruction No. 3-6, p. 3-11.

Nevertheless, it is clear that a defendant who knowingly joins a conspiracy need not know the identity of all co-conspirators, nor all their activities in the criminal enterprise.  See, e.g., First Circuit Pattern Jury Instruction 4.03, 2.13.  Indeed, a defendant need not know the entire scope of the conspiracy, nor all the details nor the means by which the objects or purposes of the conspiracy were to be accomplished.  See, e.g., Blumenthal v. United States, 332 U.S. 539, 557 (1947).

Just as clearly, the extent of a defendant's participation has no bearing on that defendant's guilt.  Criminal liability is not measured by the extent or duration of participation in the conspiracy; rather, different members of the joint criminal enterprise may perform separate

18

and entirely distinct roles.  See, e.g., 1 Sand, Modern Jury Instructions, §19.01, Instructions No.

19-6, p. 19-26.  Likewise, an individual defendant's reason for joining the conspiracy is

irrelevant.  "Regardless of what the conspirator hopes to get out of it, conspiracy is a criminal

act, and the issue properly phrased is whether the defendant knowingly and intentionally entered

into the conspiracy." United States v. Badolato, 701 F.2d 915, 921-22 (11th cir. 1983).

It is also important to note that defendants can be convicted as aiders and abettors in the

counts where they are charged, both the Conspiracy count and substantive counts.

1.    Conviction For Aiding and Abetting Does Not Require a Specific
      Allegation of "Aiding and Abetting" or Reference to 18 U.S.C. § 2

The jury may be instructed on "aiding and abetting," and the defendants may thereby be

convicted on each charge for which they have been indicted, without regard to whether the

Indictment specifically charged aiding and abetting or referenced 18 U.S.C. § 2.  United States v.

Sanchez, 917 F.2d 607, 611 (1st Cir. 1990).  See also United States v. Moya-Gomez, 860 F.2d

706, 756 (7th Cir. 1988); United States v. Thirion, 813 F.2d 146, 151 (8th Cir. 1987); United

States v. Martin, 747 F.2d 1404, 1407 (11th Cir. 1984); United States v. Galiffa, 734 F.3d 306

(7tth Cir. 1984); United States v. Walker, 621 F.2d 163, 166 (5th Cir. 1980); United States v.

Taylor, 464 F.2d 240, 241 n.1 (2d Cir. 1972); United States v. Lester, 363 F.2d 68, 72 (6th Cir.

1966).  In Sanchez, the First Circuit declared:

> All courts of appeals which have considered the matter have concluded
> that an "aiding and abetting" instruction may be given even though the
> indictment neither alleges aiding and abetting nor adverts to 18 U.S.C. §2.
> (footnote citations omitted). We, too, now hold that the government may
> rely on an "aiding and abetting" theory, although the indictment neither
> alleges nor adverts to it, except on a showing of unfair surprise.

917 F.2d at 611.

2.    Defendants Can Be Convicted For Aiding and Abetting The Charged Conspiracy

Even if a defendant were to assert that his conduct merely facilitated an extant conspiracy

which was otherwise not of his making, that defendant can be convicted where he acted in a

manner to support the conspiracy.

The First Circuit has declared that "[f]ederal law allows for the crime of aiding and

abetting a conspiracy." United States v. Marino, 277 F.3d 11 , 30 (1st Cir. 2002) (citing United

States v. Oreto, 37 F.3d 739 (1st Cir. 1994)).  The court further noted that –

> Federal courts and commentators have stated the concern that without
> a rule which allows for conviction for aiding and abetting a conspiracy,
> people who knowingly help an illegal conspiracy would go unpunished.

Id. at 30(citing United States v. Galiffa, 734 F.2d 306 (7th Cir. 1984).

In Oreto, the First Circuit affirmed convictions of three defendants jointly tried on RICO

conspiracy and substantive offenses arising from a loan sharking ring.  The predicate acts

specified in the indictment against two of the defendants were conspiracies to collect individual

loans by extortionate means in violation of 18 U.S.C. § 894.  The Appellate Court noted that

"[t]he government did not show that [the two] participated in the enterprise's decision making;

but they and other collectors were plainly integral to carrying out the collection process."  Oreto,

37 F.3d at 750.  The trial court instructed the jury that it could find a pattern of racketeering

activity if the defendants either committed or aided and abetted the commission of at least two of

the specified racketeering acts (§ 894 conspiracies).  The defendants objected to the jury

instruction.  In affirming the convictions, the First Circuit declared:

> [o]ur court has observed that '[a]iding and abetting is an
> alternative charge in every count, whether explicit or implicit,'
> (citations omitted), and it appears that most if not all courts to
> consider the issue have held that a defendant may be convicted of
> aiding and abetting a conspiracy.

Oreto, 37 F.3d at 751.

The Seventh Circuit in Galiffa set out a rational method, instructive in the present case,

for determining whether a defendant can be convicted for aiding and abetting a conspiracy.  The

court applied the following evaluative criteria:

(1) Whether one can aid and abet a conspiracy;
(2) Whether the defendant had knowledge of the conspiracy;
(3) Whether the defendant did in fact aid and abet the conspiracy;
(4) Whether the Indictment sufficiently informed the defendant of the crime charged.

Galiffa, 734 F.2d at 309-313.

With regard to the first determination in Galiffa, the question of whether one can aid and

abet a conspiracy was affirmatively resolved by the First Circuit in its Otero decision and

reaffirmed in Marino. Moreover, other courts considering the matter, including two cited in

Oreto, have held that a person may be convicted of aiding and abetting a conspiracy. See, e.g.,

United States v. Spenser, 92 Fed. Appx 865, 867 (3d Cir. 2004) (defendant's conviction affirmed

for aiding and abetting a conspiracy to possess cocaine base and heroin); United States v. Portac,

Inc., 869 F.2d 1288, 1293 (9th Cir. 1988) (corporate defendant was not eligible to participate

directly in competitive government bid, but participated with other logging companies in

unlawful bidding agreement); United States v. Lane, 514 F.2d 22, 26-27 (9th Cir. 1975)

(defendant acting as sentinel and warning conspirators of police activity). See also Galiffa, 734

F.2d at 310.

Therefore, one can be convicted of aiding and abetting a conspiracy, and general

principles of proving aiding and abetting apply to the substantive offense of conspiracy. The two

elements the Government must establish to prove aiding and abetting generally are:

1. One or more Principal committed the substantive offense.
2. The defendant "became associated with the endeavor and took part in it, intending to ensure its success."

See United States v. Rivera-Rivera, No. 99-1196, 1999 U.S. App. Lexis 30760, *2 (1st Cir. Nov.

24, 1999) (quoting United States v. Spinney, 65 F.3d 231, 234-35 (1st Cir. 1995)); United States

v. Loder, 23 F.3d 586, 590-91 (1st Cir. 1994).

The question then becomes what proof is required to establish the defendant's association, participation and intent regarding the Conspiracy. The second determination proposed in Galiffa is the **knowledge** that the Government must prove the defendant possessed. Applied to the instant matter, a defendant can be found guilty of aiding and abetting a conspiracy where: (1) the person commits an act designed to further the conspiracy, while (2) knowing of the conspiracy's existence at the time of his act. See, e.g., Galiffa, 734 F.2d at 309-10; Lane, 514 F.2d at 26-27 (it is enough that the defendant knew of the conspiracy and acted with criminal intent and design to assist the conspirators).

The Government's burden of proof of the defendant's **knowledge** (and criminal intent) as an aider and abettor can be met by a showing of circumstantial evidence. See, e.g., United States v. Spinney, 65 F.3d at 233-34; United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995); United States v. Corpus, 882 F.2d 546, 550 (1st Cir. 1989) (knowing participation in a criminal venture may be inferred from circumstantial evidence); United States v. Campa, 679 F.2d 1006, 1010 (1st Cir. 1982) (proof that aider and abettor shared in the principal's criminal intent "may be inferred from the attendant facts and circumstances.").

The third determination proposed in Galiffa is the Government's proof of the **intent** with which the defendant acted.[13]

> Having determined that one can aid and abet a conspiracy and that [the defendant] did have knowledge of the conspiracy, it must be determined whether [the defendant] did in fact aid and abet the

---

[13] As with knowledge, the defendant's intent can be shown by circumstantial evidence. See cases collected above. In addition, the defendant's criminal intent may be established through sufficient proof of wilful blindness.

> conspiracy.  In order to aid and abet the evidence must
> demonstrate that the defendant "was associated with a criminal
> venture, participated in it as something he wished to bring about,
> and sought by his actions to make it succeed. (citations omitted).

<u>Galiffa</u>, 734 F.2d at 311.

This same standard has been applied in the First Circuit.  <u>See</u> <u>United States v. Spinney</u>,
65 F.3d at 234-35; <u>United States v. Loder</u>, 23 F.3d at 590-91.  Of course, the Government is not
required to prove that the defendant was aware of the details of the conspiracy or the details of
the execution of the conspiracy offense.  <u>Spinney</u>,  65 F.3d at 234-35; <u>Taylor</u>, 54 F.3d at 975;
<u>Oreto</u>, 37 F.3d at 751; <u>Loder</u>, 23 F.3d at 590-91; <u>Galiffa</u>, 734 F.2d at 309-310.

The fourth criteria under <u>Galiffa</u> is whether the indictment sufficiently informed the
defendant of the crime charged.  In <u>Galiffa</u>, the defendant argued that the district court erred by
instructing the jury on aiding and abetting the conspiracy where the indictment did not
specifically charge the defendant under Title 18, United States Code, Section 2.  The court
rejected the claim of error for the reason that --

> 18 U.S.C. § 2 does not create a separate offense.  It simply makes
> those who aided and abetted a crime punishable as principals.
> (citations omitted).  We therefore hold that there was no fatal
> amendment to the indictment where the defendant may have been
> convicted as a principal in the conspiracy by aiding and abetting
> the conspiracy even though he was not charged with aiding and
> abetting in the original indictment.

<u>Galiffa</u>, 734 F.2d 312.[14]

The <u>Galiffa</u> decision has been unsuccessfully challenged.  In <u>United States v. Irwin</u>, 149

---

[14]   <u>See</u> <u>United States v. Sanchez</u>, 917 F.2d at 611, where the First Circuit held that an
aiding and abetting instruction is appropriate when supported by the evidence at trial and may be
given even though the indictment neither alleges aiding and abetting nor adverts to Section 2.

F.3d 565 (7th Cir. 1998) the defendant challenged her conviction of aiding and abetting a drug

conspiracy in violation of 21 U.S.C. § 846.  The defendant argued that subsequent case law,

specifically United States v. Shabani, 513 U.S. 10 (1994), had invalidated Galiffa.  Id. at 570.

Her argument was based on language in Shabani which stated that a "[c]onspiracy is an inchoate

offense, the essence of which is an agreement to commit an unlawful act."  Id. (quoting Shabani,

513 U.S. at 16).   Defendant Irwin specifically argued that "because a conspiracy is an agreement

to commit an unlawful act, one can only aid and abet a conspiracy by aiding the formation of the

agreement...."  Id.[15]  Further, Irwin argued that any aid given to a conspirator after the agreement

is made should at most constitute an accessory after the fact, not an aider and abettor.  Id. at 571.

In addressing the defendant's argument, the court stated that

> We acknowledge that there is some logic to Irwin's argument that treating the
> crime of conspiracy as having been committed when the agreement is made
> conflicts with treating one who assists after the agreement is made as an aider and
> abettor rather than accessory after the fact.  But we frequently treat a conspiracy
> as an ongoing enterprise and analyze it with respect to the conspiracy's object,
> goal, or purpose. ... Thus we find no contradiction in concluding that one can be
> guilty of aiding and abetting the crime of conspiracy by furthering the success of
> the conspiracy's object, goal, or purpose.  This is so because when assessing the
> liability for the conspirators themselves these terms guide our analysis.

Id.

Finally, in addressing the difference between an aider and abettor and an accessory after

the fact the court noted that –

> [t]he difference between an aider and abettor and an accomplice after the fact is

---

[15]   The defendant specifically cited Shabani in making this argument because the
Supreme Court held that an overt act is not required for a narcotics conspiracy, only proof of an
agreement to join the conspiracy is necessary to violate 21 U.S.C. § 846.  Shabani, 513 U.S. at
15. Defendant Irwin asserted it should follow that if only an agreement is needed to violate 21
U.S.C. § 846, one can only be guilty of aiding and abetting that agreement.  Irwin, 149 F.3d at
570.

> not judged simply by asking whether the one aided could, when the aid is given, already be found guilty of the crime.  Accessories after the fact are ones who give aid after the criminal endeavor has ended to keep the one aided from being caught or punished.

Id.

This same issue was affirmatively resolved in the First Circuit.  In United States v. Vega, No. 99-1002, 2000 U.S. App. Lexis 25674, * 6 (1st Cir. Oct.11, 2000), the defendant challenged his conviction for aiding and a abetting a conspiracy under 21 U.S.C. § 846 because he was not involved in the original agreement.  The First Circuit held that it does not matter whether a person is privy to the conspiracy at its commencement.  Id. at 7.  "To the contrary, the law is settled that a defendant cannot 'escape criminal responsibility on the grounds that he did not join the conspiracy until well after its inception.'" Id (quoting United States v. Pool, 660 F.2d 547, 560 (5th Cir. 1981).

**D.      Defense claim that one or more defendants lacked specific intent**

In the event that a defendant were to claim that he did not possess the requisite intent to commit the charged crimes, the evidence will establish that each defendant knowingly and wilfully participated, albeit by individualized means, in those offenses.  Even absent such proof of what each defendant knew and intended by his actions, conduct of defendants in this case will at a minimum hold them criminally liable under wilful blindness.  See, e.g., First Circuit Pattern Jury Instruction 2.14.

A willful blindness instruction is warranted even where there is evidence that the defendant had direct knowledge of the criminal acts.  "As long as separate and distinct evidence supports a defendant's deliberate avoidance of knowledge and the possibility exists that the jury does not credit the evidence of direct knowledge, a willful blindness instruction may be

appropriate." United States v. Bilis, 170 F.3d 88, 93 (1st Cir. 1999).

Even where a defendant claims to not have direct knowledge of the criminal acts, a finding of willful blindness is sufficient to support a verdict of guilty. Cf. United States v. Coviello, 225 F.3d 54, 70 (1st Cir. 2000) (willful blindness sufficient to support jury's guilty verdict in interstate theft case where defendant claimed a lack of knowledge and facts suggested a conscious course of deliberate ignorance); United States v. Singh, 222 F.3d 6, 11 (1st Cir. 2000). In determining whether the facts suggest the type of deliberate avoidance warranting a finding of willful blindness, the court must consider whether the evidence reveals "flags" of suspicion that, uninvestigated, suggest willful blindness. Id.

In this prosecution, any defense reliance upon supposed lack of specific knowledge and specific intent that the charged activities constituted frauds in concert with others could only be premised upon an absolute and deliberate disregard for the obvious.

Respectfully submitted this 24th day of March, 2006.

<div style="margin-left: 50%;">

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY


By: /s/ VICTOR A. WILD
VICTOR A. WILD
Assistant U.S. Attorney

</div>

26